This is 4090565, Malding Development v. The City of Springfield. We have for the appellant, Donald Craven, for the appellee, Tracy Johansen. Mr. Craven. Thank you, Your Honor. Good morning. Happy anniversary, Mr. Craven. Happy anniversary. May it please the court, counsel. This case comes back to this court on remand. At the last oral argument before this court, Justice Connick asked the City a question along these lines. The trial court found that you breached the contract and you did not appeal from that finding. So isn't the question we face how much you owe resulting from that breach? The opinion of this court adopted that question as the basis of its opinion and held that Malding is entitled to damages naturally flowing from that breach of contract. That opinion specifically refers to lost profits, cost of construction and financing, and any other delayed damages resulting from the City's breach. This court remanded the matter to the Circuit Court, instructing that court to hold a hearing on the elements of damages based on construction in November of 2003, the date of the breach, through the date of the hearing. Essentially, the trial court was instructed to compare construction of the project in 2003 and 2009 and to award those damages established with a fair degree of probability. That's exactly what Malding did on remand. We followed this court's instructions to a T. We presented expert testimony in the cost of building this project in 2003 and building this project in 2009. Craig Bridell from ARCO presented detailed testimony about those costs and summarized those construction expenses in a pair of exhibits, presenting final construction costs in 2003 and 2009, comparing, as he says, apples to apples. The City presented an expert on construction costs, Mr. Jacobson, who did not challenge Mr. Bridell's construction cost estimates. He began compiling construction cost information and stopped. Also during the last oral argument on this case, Justice Appleton asked the City, couldn't you go get Silvagio Steele to come in and tell the City how much it would cost to build these buildings? Despite the specific instructions from this court on remand, the City presented no evidence on the cost of constructing these buildings in either 2003 or 2009. The only construction cost figures on this record come from Malding and ARCO. Mr. Jacobson focused instead on whether the building should be metal or concrete. He reviewed building plans submitted in 2002 by Mr. Malding for a metal building on cross-examination. However, Mr. Jacobson had to agree that Malding had changed his plans to concrete tilt-up buildings prior to the City's breach in 2003. We also presented expert testimony from Mike Johnson on the issue of financing costs. Mr. Johnson testified about his knowledge of Mr. Malding, his past performance with commercial properties, and his past performance on loans for commercial construction. Mr. Johnson presented the court with the structure of the financial package available to Mr. Malding through U.S. Bank in 2003, including the structure of the note and the interest rate which would have been charged for construction and for permanent financing. Mike Johnson also testified about the structure of the financing package that he would have made available to Mr. Malding in 2009, again including the interest rates that would have been charged for each of the three tiers of financing that would be necessary in 2009. He presented the summary of those figures to the court. In response, the City presented the testimony of Steve McAuliffe. Mr. McAuliffe, although experienced in the banking industry, has no banking history with Mr. Malding and had no knowledge of the financial standing of Mr. Malding individually. He had no experience with Mr. Malding in commercial properties. Mr. McAuliffe concurred with Mr. Johnson's analysis of the structure of the loan package for 2003, disagreeing slightly with the interest rate which would have been charged on the financing package in 2003. But he again acknowledged that Mr. Johnson had a more complete financial picture of Mr. Malding available to him than did Mr. McAuliffe. As to the 2009 financing for these buildings, Mr. McAuliffe presented no figures to counter Mr. Johnson's testimony. He simply provided no figures, no structure for a 2009 financing package. The only evidence in this record on financing in 2009 comes from Malding. Mr. Malding also presented the expert testimony of Barry Taft on the profits, on the rents that Mr. Malding would have earned based on construction in 2003 and again based on construction in 2009. Mr. Taft is an MAI certified real estate appraiser with experience both as an appraiser and as a broker in the Springfield market. He testified about the fair market rents for warehouse space in 2003 and how long it would take to fill the project after construction, which he referred to as the absorption period. He also testified about fair market rates and absorption periods in 2009. In both cases he based those opinions on the standard type of market analysis used by appraisers in court cases every day. In response, as with Mr. Jacobson and the issue of construction costs, the city witness was retained not to present any contrasting numbers, not to present any contrasting information to the court, but only to take issue with Mr. Taft's analysis. Randy Johnson did not do an independent appraisal, but he presented his opinion that the opinion of Mr. Taft could not be adopted by the trial court. The trial court made no such finding that Mr. Taft's analysis was so defective that it could not be considered and in fact accepted Mr. Taft's testimony as an expert witness. At one point on cross-examination, Randy Johnson did offer that he would have pegged the 2003 rent at $4 a square foot in contrast to the $4.95 determined by Mr. Taft. Aside from that observation, the only figures on rent in this record come from Mr. Malding. Mr. Malding himself testified about the out-of-pocket costs that he had paid, the interest paid on the real estate loans, engineering costs, etc. And we presented an exhibit summarizing those costs. Mr. Malding then presented the testimony of Donna Beck-Smith, the forensic accountant, who took Mr. Breidel, Mike Johnson, Mr. Taft, and Mr. Malding's testimony and compiled it in a report which was presented to the court. In that report, she set forth her assumptions, she set forth the source of each figure she used to calculate the damages, and she set forth her ultimate calculation of damages suffered by Malding as a result of the city's breach. That's the record on which the trial court has had to base its judgment. The trial court, who was very open about his disagreement with our theory of this case, and frankly with this court's opinion in this matter, on that record limited damages to the cost of construction of one metal building. The trial court did not award any damages for increased financing, for lost rental income, for out-of-pocket costs, on the theory that this project was limited to one building, not four buildings, and Mr. Malding's evidence was based on a four-warehouse project. The decision of the trial court to limit this project to one building is against the manifest way of the evidence and must be reversed, frankly, on any stand. Everything in this record points to the conclusion that both parties contemplated a four-building project. Mr. Malding testified about a four-building project, as did Mayor Hussera and Craig Rydell, the builder who was going to mark on it. The large-scale plans as submitted to and adopted by the city council call for four buildings. Back on the first trial in this matter, the city sought damages on its counterclaim, alleging that Mr. Malding and his failure to build the project breached the agreement and that Mr. Malding was responsible to the city for the loss of real estate taxes, property taxes that would have been paid on this project. The stipulation prepared for presentation by the city's witness, Mr. Vannarini, calculates those real estate taxes for a four-warehouse project, explicitly says a four-warehouse project, and those four warehouses were, in his theory, in his testimony, in his affidavit, were to be constructed simultaneously because all the real estate taxes for all four buildings become effective in the same year. The city contemplated, in its claim for damages, that this is a four-warehouse project and those four warehouses are built simultaneously. Am I correct that Mr. Malding never communicated its changing plans from the metal to the concrete and steel buildings to the city? Mr. Malding did not inform the city that we were going to build a metal building. There is nothing in this contract that says these warehouses shall be metal or these warehouses shall be concrete or these warehouses shall be stick-built. This is a contract which imposes on us the obligation to build warehouses. We had no obligation to negotiate with the city about whether they were going to be metal in the first place. That's an item left open in the contract. If the city wanted metal warehouses, they could have negotiated that item into the contract and imposed upon us the obligation to build metal buildings. Or if they really wanted a metal building, they could have approved the building permit application which has been on file with the city since 2002 and has yet to be acted on. But there is nothing in the contract which requires that this be metal or concrete. While we're on the issue of the 2002 building plans, let me explain how that happened. In the first trial in this matter, there was evidence about a fast-track proposal that the city and Mr. Malding wanted to fast-track this project through. In order to do that, what Mr. Malding agreed to do was build one building while the land development process was going forward. Until such time as the city approves a final plan and approves the large-scale plans in the development process, Mr. Malding could only build, according to city code, one building on this piece of property. He couldn't build four at a time. He could only build one. He submitted, therefore, according to the fast-track proposal, building plans for one building and expected that to be approved in August of 2002. It has yet to be approved. The city has yet to take action on that building permit application. But that's why he submitted plans for one building and only one building. That's all he could build at that point. The trial court found, as I said earlier, that this was a one-building project. But not even the trial court was convinced that this was a one-building project. Because the trial court also included in its order that Malding was not precluded from damages for the other three buildings. Now, the trial court doesn't explain in what venue Mr. Malding would recover the damages for the other three buildings. But the trial court offers that Mr. Malding was not precluded from those damages. Obviously, undercutting his conclusion that Mr. Malding is entitled to damages for only one building. We submitted to the trial court evidence of the construction costs and financing costs for four buildings constructed simultaneously. Why did we do that? We did that for several reasons. In 2009, given the city council approval of the large-scale plans and final plan, Malding is now able to build all four buildings at once, simultaneously, on this land. That once and simultaneously probably means the same thing. It's cheaper for Malding to build all four buildings at once. In 2002, until such time as the city council approved the large-scale plans, we could not do so. But by building them all four at once, we save mobilization costs, and frankly, to some extent, it's a mitigation of damages. As I noted, neither the economic development agreement signed by the city, nor any other agreement with Mr. Malding, limits Malding to a specific type of building material. The finding that the contract required some sort of negotiation with the city to change from metal to concrete is simply in error. The only evidence in this record on the issue of financing essentially comes from Mike Johnson. Mr. McAuliffe does quibble slightly with the interest rate, which would have been charged in 2003, and the staggering of payments under the construction loan. We submit that those are, if anything, simply appropriate for slight deductions from the calculations of Mrs. Smith. But it's not a basis for the denial of all damages to Mr. Malding. On the issue of out-of-pocket expenses, Mr. Malding took seriously this court's opinion in the first instance. We submitted evidence on all aspects of this project in 2002. Obviously, it's been moving forward. Mr. Malding has tried all kinds of things to make this project move along. He added some property on Cockrell Lane for the drainage. But essentially, when all is said and done, this project comes down to 26 acres of a 37-acre parcel controlled by Mr. Malding on Wabash Avenue. Mr. Malding and Mr. Johnson testified that they always considered this to be a 37-acre project. The trial court wants to limit it to a 26-acre parcel based on the final plan, which is that same document that depicts four buildings. This record supports the calculation of construction costs, interest rates, rental income, out-of-pocket costs on either the 26 or the 37-acre parcel. Mr. Malding testified about those costs. Donna Beck Smith testified about those costs. The out-of-pocket costs are all related, as testified to by Mr. Malding, are included in this project. In sum, this record contains evidence presented almost entirely by Mr. Malding of the changes in those construction costs and related damages flowing from the city's breach. We urge this court to enter judgment for Mr. Malding based on the damages calculated by Donna Beck Smith, which is reflected on page 44 of the brief, at a minimum for the 26 acres depicted on the final plan. There is sufficient evidence in this record to enter judgment. Both parties have now been through two trials to have the opportunity to present to the trial court any evidence on the issue of damages. And it is time for this case to come to an end. We ask this court to enter judgment. Mr. Craven, I have a question about Smith's testimony. There was testimony about a long list of expenses between May 10, 2002 and May 14, 2007. My reading of the record is that this all related to the 66-acre tract and the 37-acre tract, which included the 26 acres. But she did not testify, and I don't think anybody else testified, to evidence of any expense incurred as a result of the city's breach. Am I wrong? She broke down the out-of-pocket expenses between the 66-acre tract and the 37-acre tract and backed out the expenses. So one of her calculations does not include any expenses for the 66-acre tract. But she never broke it out to 37 from the 26, correct? The interest expenses can be broken out 37 of the 26. The engineering expenses Mr. Mulding testified to were all related to the development of this project. The out-of-pocket expenses? Yes. Can they be broken out? He testified and she testified that in her review of the records of Mulding development, that the engineering expenses, let me back up. The interest she broke out, 26 to 37. The remainder of the expenses she testified, he testified that they were related to this development. And she testified that it was her review of the records of Mulding development, that the out-of-pocket expenses were related to the development of this project. Thank you. Thank you. Mr. Hanson? Good morning. May it please the Court. My name is Tracy Jo Hanson and I represent the City of Springfield on this matter. I'd like to dispel for you this notion that 26 acres can be backed out of this 37 acres. There's no evidence in the record, as Justice Myers-Koch just presented, there's no evidence in the record as to what costs are attributed to those 26 acres. There were a myriad of costs that were thrown out in the trial court and they were broken down between 37 and 66. There was never a delineation of how much of those would be 26 acres. In fact, I even asked Ms. Smith on the stand, within the 36 acres, can you differentiate between which of those costs are for the 26 acres that make up the final plaque? Her response was, not right at this moment. It is possible, if I went back and I looked at the documents, I might be able to, but I can't do that at this moment. Trial is the moment to do that. Trial is the moment to put the proof in the pudding. They placed their eggs in two different baskets, 37 acres and 66 acres. There's no way to identify, based upon any evidence or facts in the record, as to what makes up 26 acres. In addition, the standard... What about what Mr. Cramond said, that nothing in this agreement required construction of a mental building? That's correct. The agreement did not specify the type of building. That point goes to the basic contract law, that damages have to be proximately caused. Caused in fact, a legal cause. There has to be foreseeability. There was no foreseeability in the mind of the city that Malden was going to build anything other than a metal building. The only evidence that the city had as to the type of the building was the permit application. All the plans that went before the plan review folks in the building and zoning department, they only saw a metal building, and that's very clear in the record. And even Mr. Malden and his contractor testified that back in 2002, when this agreement was entered into, it was a metal building. He didn't change to a concrete building until 2003. The key in looking at the damages for this, it has to relate back to the contract. The contract was entered into in August of 2002. We can't be looking at a building that was on Mr. Malden's agenda in 2003 without some sort of communication to the city. There was not that communication. That was readily admitted in the trial court. We have to focus on the 2002 building, and it's unequivocally clear that that was a metal building. And only one metal building. In addition, I'd like to clarify Mr. Craven's statement that the flats, that the final flat, which consisted of the 26 acres, showed four buildings on it. Final flats don't show buildings on them. They break down the lot lines into acreage. That's where the 26 acres is. The crux of this is the breach of the city was failure to approve the plans. Well, the plans are for 26 acres. That's what they're limited to. In addition, his comments in that the city didn't show any evidence as to what construction costs would be. That's not the city's job. The city is the defendant. The plaintiff has the burden of proving his costs. Improving the calculations of those. It wasn't our duty to show what those increase in construction costs or even what those increase in financing costs would have been. And I think it's also important to note that the trial court heard a lot of evidence. And a lot of this comes down to credibility of witnesses and the weighing of the evidence. We have to defer to his findings on those. The standard of review is whether his ruling was against the manifest weight of evidence. There are a plethora of facts that were presented as to one building, a metal building, 26 acres. The business wasn't even established yet to be able to entitle him to lost profits. The financials. The credibility of his damages expert. And he noted she based all of her opinion on inaccurate assumptions. Assumptions that were not supported by the facts in the record. It's very important to note. ... The other point he brought out about the city's counterclaim and how the city somehow counterclaimed that there were four buildings. Never did the city ever allege that there were four buildings. The only evidence in the record is the affidavit from John Venturini where he states as an independent witness he made up calculations based upon four buildings. Judge Kelly had that evidence in the record. He weighed that evidence with all the other evidence as to whether there were four buildings or one building. He decided in favor that the evidence weighed towards one building. The city never claimed there were four. That affidavit was just based upon calculations and the relief that the plaintiffs sought. ... In addition, Mr. Craven noted that the city code states that they could only build one building because that's all the city code allows. You couldn't get a building permit because the large scale wasn't approved. So he could only build one building. He was limited to one building. That statement is completely inaccurate. City Code Section 153.188 is referenced in Volume 9 on page C0331. That city code section says you can't build any buildings until your large scale is approved. So there's no way that that argument holds weight. He's not limited to one building. He couldn't build any of them no matter how many he chose until the plans got approved. The plans did get approved. They got approved in 2004. And as far as a pending application for a building permit, the only one on file, and it is, somebody has to bring the city an application and apply to get a permit. The only one that's on file, and this is testified to in the record by several individuals including the building department manager, there's only one application for a building permit on file with the City of Springfield. That was done in 2002 and it was for one metal building. There's not been anything else. We can't issue a permit on that one metal building because the permit application has expired. That's been eight years ago. We've received nothing from Mr. Maulding that he wants to move forward with that set of plans. In addition, the contract experts testified for Mr. Maulding. He even admitted that in 2002, the only plans that were on the table were for the metal building and that he only had one metal building. He never designed plans for anything more than a metal building. Concrete buildings require foundational design. He testified that that design work wasn't even done. It wasn't done back then and it hasn't been done now. So if Mr. Maulding went over to the building department this afternoon and filed a request for a building permit for four concrete buildings, the city would probably take action on that? Absolutely. Absolutely. That's their call to duty. They've not received anything except the metal single building. It was back in 2002. And the city would allow the development to go forward? I'm sorry? The city would then allow the development to go forward? From my understanding of the record and the testimony, the plans that they submitted received several review comments. There were several things that needed to be addressed that did not meet the code. So what would have to happen is those plan reviewers, now since the code has changed, would have to go back and look to make sure that those plans were consistent. Now, they did notice back in 2002 they sent back for comments to the different engineers that this thing's not right, so you've got to come back and explain that or explain your fire extinguisher or something like that. There were little things like that. So once everything's, once plans are presented that fit the code requirements, the building department will issue a building permit. But all of those things need to be, I mean we're talking eight years ago. So if Mr. Maulding wants to build it, then he needs to come in and apply for it. I think it's important also to note that one of the key cruxes of the mandate and also black letter law is that damages have to be proximally caused by the breach. And that is the defendant's burden. Now, there's been discussion and there's been a lot of case law in the briefs and even that the trial court submitted and even the appellate court on the first one that he could potentially be reimbursed for lost profits. Yes, I don't think Judge Kelly ever said no, he can't have lost profits as a matter of law. That's always on the table. It's just that the facts don't support it. There's no proof in the pudding here. They cannot meet those criteria within the parameters of the case law. Maybe they could have, but the evidence that's presented in the record doesn't fit that bill and Judge Kelly got it right. The only thing I disagree with Judge Kelly on is his award of damages in approximately $1 million. He bases that solely on the one single statement by Craig Breidel. It's in the record in Volume 6 on page 22. He states we priced metal building scenario and through that process we also gave him alternates to go to a concrete conventional steel building. And in 2003 that was the direction the process of the project was going. So what we did is we priced concrete buildings, but if we priced metal building in 2003 and the metal building in 2009, the delta between those numbers is relatively the same. So if his duty is to compare apples to apples, a 2003 minus a 2009, he's stating if we did the metal building in 2003, x, and if we did the metal building in 2009, y, x minus y delta is the same. So there's no cost difference is what that statement says. There's no cost difference between a metal building in 2003 as in 2009. There's zero evidence in the record as to any cost for a metal building. Did the city present any evidence? Absolutely not. That was not our duty. The plaintiff has to prove the damages. I'm saying in opposition to this gentleman's testimony. Absolutely not. If we were to present evidence that a metal building cost $3 a square foot, let's just say, then we would be putting evidence in the record. We would be proving the plaintiff's case for him. That's not our duty. He has to put that stuff out there. He didn't do it. I know that everybody and even the first panel on this case feels that if there's a breach then there has to be some kind of damages awarded. The plaintiff was given two opportunities to prove damages. The first trial and then again in the second trial. And it still doesn't comport with the parameters of law. There's not enough evidence there to give him those damages. In that scenario, if the court finds a breach, they can always award nominal damages. There's a lot of case law on that. Just because there's a breach of contract doesn't mean there was any damage. Damages are an element in a breach of contract case. Just because you prove the existence of a contract and a breach of that contract doesn't automatically get you to damages. That is also an element that must be proven. That was not done in this case. We would ask that you affirm the trial court's ruling in every manner except for the award of damages which are not supported by the evidence in the record. Thank you. Thank you counsel. On the issue of one building or four buildings, counsel for the city indicated that the stipulation presented by Mr. Vetterini prepared on behalf of Mr. Vetterini was prepared in relation to the relief that the plaintiff sought. We didn't seek real estate taxes as an element of damages. The only reason on this record for the preparation of this stipulation for Mr. Vetterini's testimony was to establish the damages sought by the city. The city sought lost real estate taxes their portion, its portion of the lost real estate taxes based on Mr. Mauldin's failure to build these buildings. They sought damages for a four warehouse project constructed simultaneously with real estate taxes coming due in the tax year 2006, payable in 2007. Specifically he found that based on the information provided to me, the four warehouse project would have a fair market value of close to $12 million. The four warehouse project constructed simultaneously. This court found in its first decision that the decision of Mr. Mauldin to proceed, to not proceed was a sound business decision because of the increase in costs. What about the city's argument that you never established the value that was awarded to you by Judge Kelly? We disagree with the the word Delta means the difference, meaning the spread between the cost of metal building here and the cost of concrete building here, metal building here and metal building here. This increases 30%. This increases 30%. That change is the same. I understand that. Did the city cross appeal? Yes. That issue? Yes. And did you respond to that? Yes. Saying very simply that Mr. Bridell's testimony does support to that extent does support Judge Kelly's decision that the change in the cost of the metal building is the same as it was in 2003 and 2009. Judge Kelly also ruled essentially as a matter of law that the damages about lost profits were too speculative. Everybody who negotiated this contract and everybody who entered into this contract expected Mr. Mauldin to be able to put tenants into these warehouses. I don't think the Mayor and Sarah entered into this to build four warehouses on Wabash Avenue so they would sit empty. Mr. Johnson testified about Mr. Mauldin's ability to fill projects. Mr. Taft testified about the ability to fill projects and the expected absorption period. Judge Kelly rejected as a matter of law all damages on lost profits because they were too speculative because the cow may not get pregnant. Citing the R-10, I think it's the R-10 case that because of a physical impossibility of a cow not being able to carry young that the lost income from young cows is too speculative. I would submit that the difference between a cow and a warehouse and the lack of a physical impossibility in this case distinguishes the lost profits in this case from the lost profits in the cow case. Is there a record that establishes your client's business practices and history? Yes, both his own testimony and the testimony of Mike Johnson, the banker who submitted the financing packages. And those totals come to what? Let me back up on your first question, Judge. Lost profits. The totals on lost profits are on page 44 of the brief. Income to $5,308,031. Based on the changes in rent from 2003 and 2009 and a longer absorption period given the market in 2009 ... Anything further? No, I was just seeing if there were any other questions.